IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| HI-TECH PHARMACEUTICALS, INC., | ) ) ) | |
| Plaintiff, | ) ) | CASE NO.: |
| v. | ) ) | |
| THERMOLIFE INTERNATIONAL, LLC AND RONALD KRAMER, | ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## COMPLAINT

COMES NOW, Hi-Tech Pharmaceuticals, Inc. ("Hi-Tech") and files its Complaint against ThermoLife International, LLC ("ThermoLife") and Ronald Kramer ("Kramer") ("Defendants" collectively), stating as follows:

## THE PARTIES

1.      Plaintiff Hi-Tech Pharmaceuticals, Inc., ("Hi-Tech") is corporation organized and existing under the laws of the State of Georgia, with its principal place of business located at 6015-B Unity Drive, Norcross, Georgia, 30071.  Hi-Tech is a leading manufacturer of dietary supplement products and sells, distributes, and markets its products in various states in the United States and to other countries.

2.     ThermoLife International, LLC ("ThermoLife") is allegedly incorporated in Arizona with a place of business at 1181 Ocean Front Walk, Venice, California 90291.   ThermoLife lists its domestic physical address as 1334 East Chandler Boulevard, #5-D76, Phoenix, Arizona 85048 with the Arizona Corporation Commission and states it can be served with process at this address.  However, this address is not a physical location, but merely a post office box.

3.     Upon information and belief, ThermoLife does not maintain a place of business or keep assets within the State of Georgia.

4.     Ronald Kramer ("Kramer") is the President, Chief Executive Officer, and sole owner of ThermoLife and a resident of the State of Arizona.   Upon information and belief, Kramer can be served with service of process at 3815 West Lawrence Road, Phoenix, Arizona 85019.

5.     Upon information and belief, Kramer, as President, Chief Executive Officer, and sole owner of ThermoLife, controls all actions of ThermoLife and is the architect of the bad faith and fraudulent activities described herein.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over these claims pursuant to 15 U.S.C § 1331 (federal question), 15 U.S.C § 1121 (Lanham Act claims), 28 U.S.C. 1338 (patent claims); 28 U.S.C. §§ 2201 and 2203 (declaratory judgment);

28 U.S.C § 1367 (supplemental jurisdiction), and 28 U.S.C. § 1332 (diversity), because this action is between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds seventy-five thousand dollars ($75,000.00).

7.    This Court has personal jurisdiction over Defendants, and venue in this District is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Hi-Tech's claims occurred in this District, a substantial part of the property that is the subject of this action (*i.e.* Hi-Tech's property interest in the conduct of its business) is situated in this District, and because Defendants are subject to the personal jurisdiction of this Court.

8.    This Court has personal jurisdiction over Defendants because, *inter alia*, ThermoLife, and Kramer in the name of ThermoLife, has previously filed bad faith patent infringement actions against Hi-Tech and its President and CEO in this judicial District. Civil Action File Numbers, 1:15-cv-00892-ELR, 1:15-cv-00893-ELR, and 1:15-cv-00894-ELR.

9.    This Court has also personal jurisdiction over Defendants pursuant to O.C.G.A. § 9-10-91 because they, in person or through an agent, have committed tortious acts and omissions within this State and/or have caused tortious injury within this State while engaging in a persistent course of conduct within this State.

10.    This Court also has personal jurisdiction over Defendants because, as shown by the previously filed patent actions in this District as well as other jurisdictions, and as shown by their March 26, 2016 cease and desist letter discussed herein, they directed and targeted their activities at Georgia residents Hi-Tech and Jared Wheat, and the effects of those activities arose in Georgia.  As set forth herein, Hi-Tech's claims against Defendants arise out of and relate to these activities.

11.    Further, as shown by the previously filed patent actions in this District, which were filed by their Georgia counsel, and as shown by their March 26, 2016 cease and desist letter discussed herein, Defendants have purposefully done some act and/or consummated some transaction in Georgia.

12.    This Court also has personal jurisdiction over Kramer under conspiracy jurisdiction, whereby the actions of ThermoLife are imputed to Kramer to support personal jurisdiction over Kramer, as the purpose of the conspiracy was, and is, to commit intentional torts against Hi-Tech and Mr. Wheat, Georgia residents.

## **EXISTENCE OF ACTUAL CONTROVERSY**

13.    There is a real, immediate, and substantial controversy between Hi-Tech and Defendants regarding the validity and infringement of ThermoLife's recently-licensed patent.

14.    Upon information and belief, ThermoLife has recently begun to threaten Hi-Tech and other dietary supplement companies with allegations that products marketed and sold purportedly infringe upon U.S. Patent Number 9,180,140 ("the '140 patent"). These circumstances, coupled with ThermoLife's various other patent infringement suits filed against Hi-Tech, create reasonable apprehension on the part of Hi-Tech that ThermoLife will file suit against it relating to the '140 patent.

15.    Defendants have created uncertainty for Hi-Tech with respect to its right to market and sell eight products, and uncertainty with respect to its right to conduct certain business with its customers, which Defendants have also threatened to sue. As set forth herein, Defendants actions with respect to the subject patent have caused actual and imminent invasion of these legally protectable interests.

16.    Hi-Tech needs patent clarity now because it has invested significant time and expense to develop its products and brands, which are accused of infringing the '140 patent. To clarify its rights and redress this injury, Hi-Tech seeks declaratory judgments that its products do not infringe any valid claim of the '140 patent.

## FACTUAL ALLEGATIONS

**I.     "PATENT TROLLS" AND THE BUSINESS OF LITIGATION.**

17.    Pursuant to 35 U.S.C. § 101, any person who "invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent," subject to the conditions and requirements of the law.

18.    Among other requirements for patentability, an invention cannot be patented if "the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." 5 U.S.C. § 102.

19.    In patent parlance, the term "otherwise available to the public" also refers to other types of public disclosures of the claimed invention such as, for example, an oral presentation at a scientific meeting, a demonstration at a trade show, a lecture or speech, a statement made on a radio talk show, a YouTube™ video, or a website or other online material.

20.    Moreover, the subject matter sought to be patented must be sufficiently different from what has been used or described before, such that it may be said to be non-obvious to a person having ordinary skill in the area of technology related to the invention. 5 U.S.C. § 103.

21.     Although patent examiners for the U.S. Patent and Trademark Office ("USPTO") review patent applications, not all applications approved by the examiners actually meet the legal requirements for patentability. Such erroneously approved patents may later be deemed invalid.

22.     According to an April 10, 2015 audit report by the Office of the Inspector General:

> Ensuring the issuance of high-quality patents has been a USPTO strategic initiative for many years. High-quality patents are generally considered to be those whose claims clearly define and provide clear notice of their boundaries, while low-quality patents are those that contain unclear property rights, overly broad claims, or both. Increasing concerns regarding abusive patent litigation and ambiguous patents heightens the need for USPTO to ensure adequate processes are in place to promote issuing high-quality patents.

*USPTO Needs to Strengthen Quality Assurance Practices* – Final Report no. OIG- 15-026-A, Office of Inspector General, p. 1 (April 10, 2015).

23.     The Office of the Inspector General recently audited the USPTO's patent quality assurance practices and found, among other things, that the USPTO's policies and procedures are ineffective at measuring whether examiners are issuing high-quality patents, and that the USPTO's official quality metrics may under-represent the true error rate. *See generally Id*.

24.     Indeed, the Inspector General's report suggests that due to the nature of financial incentives given to patent examiners by the USPTO, examiners tend to issue more patents they label "high-quality" even if the patents are not. See Id., p. 19.

25.     The erroneous over-approval of patent applications by the USPTO can lead to abusive patent litigation by those applying for and/or owning the improper patents in question. *See id*., p. 9. In other words, the patent owners use the patents solely to enforce intellectual property rights rather than for legitimate commerce.

26.     Abusive patent litigation has also been initiated by entities who purchase or otherwise obtain patents, which may or may not be valid, not to actually utilize the invention, but rather for the sole purpose of threatening enforcement for alleged violations of the patent. Such entities are known as "non- practicing entities", or more popularly, "patent trolls".

27.     A federal appellate judge and his two prominent co-authors articulated the problems resulting from such abusive litigation:

> The onslaught of litigation brought by "patent trolls" — who typically buy up a slew of patents, then sue anyone and everyone who might  be using or selling the claimed inventions — has slowed the development of new products, increased costs for businesses and consumers,  and clogged our judicial system.
>
> Their business plan is simple: trolls (intellectual-property lawyers use less  evocative  terms  like  "non-practicing  entities"  and  "patent-

assertion entities") make money by threatening companies with expensive lawsuits and then using that cudgel, rather than the merits of a case, to extract a financial settlement. In the apt summary of President Obama, who on Tuesday announced a plan to stave off frivolous patent litigation, trolls just want to "hijack somebody else's idea and see if they can extort some money."

…

In the meantime, vexatious patent litigation continues to grind through our already crowded courts, costing defendants and taxpayers tens of billions of dollars each year and delaying justice for those who legitimately need a fair hearing of their claims. Trolls, in fact, filed the majority of the roughly 4,700 patent suits in 2012 — and many of those were against small companies and start-ups that often can't afford to fight back.

Hon. Randall R. Rader, Chien & Hricik, *Make Patent Trolls Pay in Court*, N.Y. Times, Jun. 4, 2013, at A25; http://www.nytimes.com/2013/06/05/opinion/make -patent-trolls-pay-in-court.html.

28.    In an attempt to address this type of abusive and frivolous litigation, several states, including Georgia, have passed "anti-patent trolling" statutes. See, e.g., O.C.G.A. § 10-1-770, *et seq.*

## II.    DEFENDANTS' BUSINESS AS A PATENT TROLL.

29.    ThermoLife purports to be "a leading manufacturer in the sports nutrition and supplement industry." Complaint, ¶ 1.

30.    In reality, however, ThermoLife does not manufacture any product it sells to consumers and has minimal employees.

31.    Moreover, as of the time of this filing, only three of the 11 ThermoLife products displayed on its website are available for sale. All other ThermoLife products on the website are listed as being "out of stock" or are otherwise unavailable for purchase.

32.    Upon information and belief, many or the majority of ThermoLife's products displayed on its website have been "out of stock" or otherwise unavailable for purchase for the past several years.

33.    Upon information and belief, ThermoLife also does not currently sell its products through third-party retailers or distributors, as is customary in the industry.

34.    ThermoLife, rather, operates it business primarily to sue or threaten to sue manufacturers and retailers in the industry for alleged patent infringement relating to the manufacturer or retailers' sale of their own products.

35.    Upon information and belief, ThermoLife is therefore nothing more than a sham corporation used by Kramer to function as a "patent troll," using its three products to effectuate its coercive purposes. Upon information and belief, ThermoLife is not engaged in any significant sale of products which could support its operation, and exists and functions for the primary purpose of acting as a patent troll. Upon further information and belief, Kramer performs these patent trolling

activities in the name of ThermoLife in attempt to shield himself from personal liability, but there is such unity of interest and ownership that separate personalities of ThermoLife and Kramer no longer exist.  Under these circumstances, to observe the corporate form of ThermoLife would be to sanction a fraud by Kramer.

36.    Defendants have filed dozens of lawsuits against dietary supplement manufacturers and retailers for alleged patent infringement. For example, since 2011 ThermoLife has filed more than 100 patent infringement actions against the dietary supplement industry in Arizona, California, Florida, Georgia, New Jersey and Pennsylvania district courts.  In 2013 alone, ThermoLife was the third most litigious patent plaintiff in the federal courts, with 117 new infringement actions filed.  *See*, https://www.law.berkeley.edu/files/2013_Patent_Litigation_Year_in_Review_Full _Report_(MLex_Machina).pdf.  Defendants have filed these suits in various jurisdictions across multiple states.

37.    However, upon information and belief, Defendants have not yet obtained a single verdict or judgment (except via default judgments and excluding settlements) wherein it was adjudicated that anyone has infringed upon one of Defendants' patents.

38.    Upon information and belief, Defendants filed the numerous lawsuits against dietary supplement manufacturers and retailers for the sole purpose of

coercing settlements and licensing agreements and have, as a result, made significant sums of money from the coercion.

### III. DEFENDANTS' FRAUDULENT LAWSUITS AGAINST HI-TECH FOR ALLEGED PATENT INFRINGEMENT

39.     Upon information and belief, Kramer participated in, directed, controlled, caused, ratified, and/or was the moving force and primary participant behind several previous meritless and fraudulent lawsuits against Hi-Tech, and the circulation of related false, misleading, and defamatory representations to third parties as set forth herein.

40.     Indeed, Kramer his significant personal animosity towards Jared Wheat, as evidenced by Kramer's blog posts on the ThermoLife website:

> [Hi-Tech owner and CEO] Jared Wheat (scum of the earth) … and quite a few others soon to be named are all going to get the legal equivalent of getting f****ed in the a** with a rusty pipe and then kicked in the face till their teeth are implanted in their skulls for stealing from ThermoLife. Mark my words.

ThermoLife International Forums, Jan. 7, 2015, formerly available at http://web.archive.org/liveweb/http://www.ThermoLife.com/forum/t2446-13/ (censorship by asterisk added; "scum of the earth" parenthetical original).

41.     Another of Kramer's blog posts reads as follows:

> If you go big game hunting in Africa there is an argument whether the lion, the African elephant, the leopard, or the white rhinoceros is the

12

biggest prize BUT if you are hunting scumbags in the dietary supplement industry there is no mistake who has that title. No, it is not Jack Owack, its not even Rich Gaspari (now that he had his company taken from him he is not even relevant), the title of the biggest scum bag in the dietary supplement industry belongs to Jared Wheat of Hi-Tech Pharmaceuticals …

(formerly available on ThermoLife International Forums, March 30, 2015).

42.    Kramer has also written statements indicating that he will profit from

the proceeds of patent litigation filed against competitors:

Now thanks to Dan Pierce, Mr. Gayspari [sic] and company are going to have to pay me more damages for the sales of all Super Pump Max from the time we put them on notice until the time this new case settles … for infringing on yet 2 more patents owned by ThermoLife …

ThermoLife International Forums, June 21, 2013, formerly available at

http://web.archive.org/liveweb/http://www.thermolife.com/forum/t2446-13/.

**A. Defendants' First Suit Against Hi-Tech for Alleged Patent Infringement: ThermoLife International, LLC v. Hi-Tech Pharmaceuticals, Inc., United States District Court for the District of Arizona, Case 2:12-cv-01466.**

43.    On or about July 6, 2012, ThermoLife filed suit against Hi-Tech for

allegedly infringing ThermoLife's U.S. patent numbers 7,777,074 ("the '074

Patent") and 8,178,572 ("the '572 Patent").

44.    Defendants filed that suit in the District Court for the District of

Arizona, Case 2:12-cv-01466, ("Arizona litigation") and in the course of and in

13

furtherance of the litigation, sent or caused to be sent correspondence, pleadings, and other documents via U.S. mail and/or other interstate carrier into interstate commerce.

45.     In the Complaint in the Arizona lawsuit, Defendants fraudulently alleged that Hi-Tech infringed upon these patents because it manufactured and/or sold dietary supplement products containing Creatine Nitrate.

46.     Upon information and belief, however, ThermoLife itself did not and does not manufacture or sell any product containing Creatine Nitrate.

47.     In the course of and in furtherance of the Arizona litigation, Defendants sent or caused to be sent correspondence, pleadings, and other documents via email or other electronic submission into interstate commerce.

48.     According to the patents, which were purportedly owned by ThermoLife, Kramer and a man from Greece invented the combination of Creatine with a nitrate, or Creatine Nitrate, for use as a dietary supplement.

49.     Specifically, the '074 Patent purported to cover the invention of the Creatine Nitrate compound, among other amino acid compounds. The '572 Patent purported to cover the use of Creatine Nitrate, among other amino acid compounds, for use of improving circulation and the absorption of amino acids in the body.

50.    The '572 Patent is therefore dependent upon, or derivative of, the '074 Patent.

51.    In June of 2015, a third-party unrelated to Hi-Tech requested that the USPTO reexamine the validity of the '572 Patent at issue in the Arizona lawsuit. The third-party's request for reexamination included, but was not limited to, ThermoLife's claim regarding the use of Creatine Nitrate to improve circulation and the absorption of amino acids in the body.

52.    On or about December 23, 2015, the USPTO issued an "Office Action" rejecting both of the '572 Patent's two claims on the grounds of obviousness and/or the fact that they were described in scientific literature prior to the issuance of the patent (*i.e.* "prior art").  In other words, the UPSTO found that the '572 patent was invalid.

53.    ThermoLife subsequently filed a response to this "Office Action," amending and adding patent claims, and reiterating arguments it has unsuccessfully advanced in other patent reexamination proceedings.

54.    The USPTO's reexamination of the '572 patent remains pending as of the date of this filing.

55.    Additionally, prior to the Arizona lawsuit, a third-party unrelated to Hi-Tech requested in 2010 that the USPTO reexamine the validity of the '074 Patent at

issue in the Arizona lawsuit. The third-party's request for reexamination included, but was not limited to, ThermoLife's claim regarding the invention of Creatine Nitrate.

56.     The USPTO reexamined the '074 Patent in response to these requests and, in a detailed "Final Rejection" dated April 2, 2014, rejected ThermoLife's claim concerning the invention of Creatine Nitrate, deeming ThermoLife's patent of Creatine Nitrate invalid.

57.     The USPTO rejected the Creatine Nitrate patent claim, in part, because the combination of Creatine with a nitrate was "obvious" in light of scientific publications preceding the patent, which laid out how the compound would be nutritionally useful while more stable and better tasting than an amino acid alone (in a dietary supplement for instance), and because the Creatine Nitrate compound was described in a scientific publication as far back as 1914.

58.     In the "Final Rejection," the USPTO not only rejected ThermoLife's patent claims relating to the combination of a nitrate or nitrite with Creatine (e.g. Creatine Nitrate), but also the combination of a nitrate or nitrite with the following amino acids: Agmaine, Beta-Alanine, Citrulline, Glutamine, Isoleucine, Norvaline, and Ornithine.

59.     Despite the detailed bases on which the USPTO rejected ThermoLife's patent claim relating to Creatine Nitrate, ThermoLife appealed the Final Rejection to the Patent Trial and Appeal Board ("PTAB") in the USPTO.

60.     On February 1, 2016, the PTAB affirmed the Final Rejection of the '074 patent claim directed to Creatine Nitrate based upon the existence of "prior art," or evidence that the patent claim lacks originality.  PTAB *Decision on Appeal* attached hereto as "Exhibit A."  Notably, the three (3) patents asserted in the stayed Georgia litigation against Hi-Tech are each related to and based upon ThermoLife's '074 patent.  Further, a number of the products referenced in ThermoLife's March 26, 2016 cease and desist letter, which is discussed herein, contain creatine nitrate.

61.     ThermoLife has since requested to reopen prosecution arguing that the "prior art" relied upon by the PTAB does not invalidate the claim directed to Creatine Nitrate.  ThermoLife's arguments in this regard, however, are nothing but a repackaging of ThermoLife's previous arguments that the USPTO has already found unpersuasive.

62.     The Arizona litigation against Hi-Tech is stayed pending these USPTO proceedings.

63.     In filing the Arizona lawsuit against Hi-Tech, Defendants falsely implied that ThermoLife or its counsel had performed an adequate pre-suit

investigation to determine likely infringement and/or the validity of the '074 and '572 Patents.

64.    Neither Defendants nor their counsel, however, performed such a pre-suit investigation because an adequate investigation would have revealed the invalidity of the '074 and '572 Patents.

65.    In the alternative, Defendants and/or their counsel did perform an adequate pre-suit investigation to determine likely infringement or the validity of the '074 and '572 Patents and confirmed the invalidity of the '074 and '572 Patents, but nonetheless elected to file suit against Hi-Tech and other defendants - despite their knowledge of the Patents' legal invalidity.

66.    In sum, Defendants' assertions and legal claims on the basis of the '074 and '572 Patents were knowingly false and objectively and subjectively baseless because the '074 and '572 Patents were not valid, and Defendants knew or should have known that to be the truth.

67.    In filing the Arizona lawsuit Defendants knowingly made fraudulent statements concerning Hi-Tech's alleged infringement of the '074 and

68.    '572 Patents with the intent to mislead the Court and the public and wrongfully obtain settlement monies and/or licensing fees from Hi-Tech.

69.     Defendants also made false and misleading statements concerning Hi-Tech's alleged infringement of the '074 and '572 Patents in correspondence with Hi-Tech's customers and third parties in bad faith and with the intent to defame Hi-Tech and wrongfully interfere with Hi-Tech's business and business relationships.

70.     As a result of Defendants' defamatory communications to Hi-Tech's customers and third parties and its fraudulent allegations in the Arizona lawsuit as set forth herein, Hi-Tech has sustained damages in the form of attorney fees and litigation costs, lost business opportunities, damage to its reputation, and other damages in an amount to be determined at trial.

**B. Defendants' Second Suit Against Hi-Tech for Alleged Patent Infringement:** ***ThermoLife International, LLC v. Better Body Sports, et al.***, **United States District Court for the Central District of California, Case 2:12-cv- 09229.**

71.     On or about September 21, 2012, Defendants, through counsel, mailed or caused to be mailed into interstate commerce a letter to Hi-Tech containing false and misleading assertions that Hi-Tech was violating ThermoLife patent number 8,202,908 ("the '908 Patent") entitled "D-Aspartic Acid Supplement."

72.     Upon information and belief, however, ThermoLife does not sell any product containing D-Aspartic Acid.

73.     On or about October 5, 2012, Hi-Tech responded to Defendants' letter, directing their attention to a preexisting Italian patent ("the Italian Patent"), which

rendered the '908 patent legally invalid. In doing so, Hi- Tech provided Defendants with the details of the Italian Patent, including its application number, title, and filing date.

74.     Nevertheless, on or about October 26, 2012, Defendants filed another lawsuit against Hi-Tech, and several other entities in the dietary supplement industry in the Central District of California, Case 2:12-cv-09229, ("Central California litigation") fraudulently alleging infringement of the '908 Patent.

75.     In the Central California litigation, ThermoLife was represented by the Newport Trial Group, a California law firm that two years earlier had previously filed a complaint against ThermoLife on behalf of a plaintiff who alleged that ThermoLife was engaged in false patent marketing.

76.     Defendants filed the Central California lawsuit falsely alleging infringement of the '908 Patent and, in the course of and in furtherance of that litigation, sent or caused to be sent correspondence, pleadings, and other documents via mail and/or other interstate carrier into interstate commerce.

77.     In the course of and in furtherance of the Central California litigation, Defendants also sent or caused to be sent correspondence, pleadings, and other documents via email and/or other electronic submission into interstate commerce.

78.    The defendants in the Central California litigation filed a motion for summary judgment against ThermoLife on the basis that the preexisting Italian Patent – the very same patent referenced in Hi-Tech's pre-suit letter to Defendants – rendered the '908 Patent invalid.

79.    Consistent with Hi-Tech's pre-suit correspondence to Defendants, the District Court for the Central District of California decreed the '908 Patent invalid in light of the Italian Patent, and entered final judgment in favor of the defendants, including Hi-Tech.

80.    In sending Hi-Tech the September 21, 2012 demand letter to Hi-Tech and filing suit against Hi-Tech, Defendants falsely and misleadingly implied that Defendants or their counsel had performed an adequate pre-suit investigation to determine likely infringement and/or the validity of the '908 Patent.

81.    Neither Defendants nor their counsel, however, performed such a pre-suit investigation because an adequate investigation would have revealed the invalidity of the '908 Patent.

82.    In the alternative, Defendants and/or their counsel did perform an adequate pre-suit investigation to determine likely infringement and/or the validity of the '908 Patent and discovered the invalidity of the '908 Patent, but nonetheless elected to file suit against Hi-Tech and other defendants despite knowledge of the

'908 Patent's invalidity.  This is particularly true based upon the fact that Hi-Tech pointed out, prior to filing, the very Italian patent that the District Court in California ultimately relied upon.

83.    In sum, Defendants' assertions and legal claims on the basis of the '908 Patent in the Central California litigation were objectively and subjectively baseless and thus fraudulent because the '908 Patent was not valid, and Defendants knew or should have known that to be the case.

84.    Defendants made false and misleading statements concerning Hi-Tech's alleged infringement of the '908 Patent in its September 21, 2012 letter, and filed the subsequent lawsuit in the Central District of California in bad faith and with the intent to defraud Hi-Tech, the Court, and the public.

85.    Defendants made false and misleading statements concerning Hi-Tech's alleged infringement of the '908 Patent with the intent to wrongfully interfere with Hi-Tech's business and business relationships.

86.    As a result of Defendants' false and misleading allegations and fraudulent lawsuit set forth herein, Hi-Tech has sustained damages in the form of attorney fees and litigation costs, including those incurred to defend Hi-Tech and its customer, DNA Sports Nutrition, as well as lost business, business opportunities, damage to its reputation, and other damages in an amount to be determined at trial.

### C. Defendants' Third Suit Against Hi-Tech for Alleged Patent Infringement: *ThermoLife International, LLC v. Hi-Tech Pharmaceuticals, Inc.,* United States District Court for the Southern District of California, Case 3:13-cv-09229.

87.     Having had no previous success suing upon patents invented by Kramer and/or owned by ThermoLife, on or about April 5, 2013, Defendants filed yet another lawsuit against Hi-Tech, and several other entities in the dietary supplement industry, containing further false and misleading allegations of infringement of patent numbers 6,646,006; 6,117,872; 5,891,459; and 7,452,916 (the '006, '872, '459, and '916 Patents, respectively) – patents which ThermoLife licensed from The Board of Trustees of the Leland Stanford Junior University ("the Stanford Patents" collectively).

88.     Defendants filed the suit alleging infringement of the Stanford Patents in the Southern District of California, Case 3:13-cv-09229, ("Southern California litigation") and, in the course of and in furtherance of the litigation, sent or caused to be sent correspondence, pleadings, and other documents via mail and/or other interstate carrier into interstate commerce.

89.     In the course of and in furtherance of the Southern California litigation, Defendants sent or caused to be sent correspondence, pleadings, and other documents via email and/or other electronic submission into interstate commerce.

90.    As part of the Southern California litigation, Defendants alleged that the Stanford Patents cover specifically listed ingredients for certain purposes, and that the defendants' inclusion of these ingredients in their products constitutes infringement of the Stanford Patents.

91.    Upon information and belief, Defendants purchased licenses with respect the Stanford Patents for the sole purpose of using them as a basis upon which to bring fraudulent lawsuits against entities in the dietary supplement industry, including Hi-Tech.

92.    On February 3, 2016, Hi-Tech filed a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) and/or dismissal of ThermoLife's infringement allegations for lack of standing with prejudice pursuant to Fed. R. Civ. P 12(b)(1).  [ECF no. 162].  Hi-Tech's motion is fully briefed and under submission to the Court.

93.    This lawsuit remains pending in the District Court for the Southern District of California, and Hi-Tech contends the subject patents are invalid and/or that Hi-Tech has not otherwise infringed said patents.

94.    As a result of Defendants' fraudulent lawsuits set forth herein, Hi-Tech has sustained damages in the form of attorney fees and litigation costs, lost business

opportunities, damage to its reputation, and other damages in an amount to be determined at trial.

> ### D. Defendants' Fourth, Fifth, and Sixth Suits Against Hi- Tech for Alleged Patent Infringement: *ThermoLife International, LLC v. Hi-Tech Pharmaceuticals, Inc., et al.* United States District Court for the Northern District of Georgia, Cases 1:15-cv-00892, 1:15-cv-00893, 1:15-cv-00894.

> > #### a. Defendants' February 10, 2014 Demand Letter to Hi-Tech and Hi-Tech's Response

95.    On or about February 10, 2014, Defendants, through counsel, sent or caused to be sent into interstate commerce, via email, a demand letter to Hi- Tech containing false and misleading assertions that Hi-Tech was violating ThermoLife patents 8,178,572; 7,777,074 (the same patents at issue in the stayed Arizona litigation, the '074 Patent being the one deemed invalid by the USPTO); and 8,183,288. The letter further falsely asserted that Hi-Tech was violating ThermoLife's patent pending application numbers 8,455,531 and 8,466,187. Defendants' letter also contained website links, which purportedly provided "notice" of the patents and patent applications.

96.    In this letter, Defendants made multiple demands of Hi-Tech including, but not limited to, demands that Hi-Tech stop selling certain products, remove all marketing and advertising materials for the products, and provide Defendants with information on the products made, sold, and inventoried. Defendants also threatened

to sue Hi-Tech for its alleged infringement. Defendants did not, however, provide any explanation as to how Hi-Tech's products allegedly infringed upon the patents and patent applications in question.

97.     Hi-Tech responded to this demand letter on or about February 18, 2014, informing Defendants that the website links providing "notice" did not open, and requesting information on which of the 126 claims of the five patents or patent applications were allegedly infringed upon by Hi-Tech's products.

98.     Defendants, however, never responded to this letter or Hi- Tech's inquiries.

99.     Upon information and belief, Defendants made false and misleading statements concerning Hi-Tech's alleged infringement of the aforementioned patents and patent applications in bad faith and with the intent to wrongfully obtain settlement monies and/or licensing fees from Hi-Tech.

2.     Defendants' March 17, 2015 Demand Letter to Hi-Tech and Hi-Tech's Customers

100.   On or about March 17, 2015, approximately one year after Defendants' last correspondence, Defendants, through counsel, sent or caused to be sent into interstate commerce via interstate carrier a demand letter to Hi-Tech containing false and misleading assertions that "Hi-Tech/APS" was violating ThermoLife patent

numbers 8,445,531; 8,466,187; 8,183,288; and 8,178,572 (the '531, '187, '288, and '572 Patents, respectively).

101.  In this letter, Defendants made multiple demands of Hi-Tech including, but not limited to, demands that Hi-Tech stop selling at least five of its major products, provide written confirmation to ThermoLife that Hi-Tech has removed marketing and advertising materials for the products, provide ThermoLife with information on the quantities of the products sold, and that Hi-Tech hold all remaining inventory of the products.

102.  The letter further represented that ThermoLife was the exclusive source for the type of products allegedly covered by the Patents and/or that use of the ingredients allegedly covered by the Patents was only permissible through a license from ThermoLife.

103.  The letter also represented that ThermoLife was providing an "Initial Infringement Review," but such "Review" was legally insufficient and conclusory.

104.  The March 17, 2015 letter indicated that, in the event Hi-Tech met these demands, Defendants would be willing to discuss negotiating a resolution of the issues (i.e. resolution through Hi-Tech's payment of settlement monies and/or licensing fees). The letter further stated that, if Hi-Tech did not meet the demands,

Defendants would sue Hi-Tech and Hi-Tech's customers who sold the subject products.

105.   Upon information and belief, Defendants sent or caused to be sent into interstate commerce a copy of the above-described March 17, 2015 letter to a number of Hi-Tech's distributors and retail customers including, but not limited to, A1 Supplements, Inc. DPS Nutrition, Supplement Central, I- Supplements.com, I'llpumpyouupcom, Evitamins, Suppz, Inc., SupplementWarehouse.com, Island Supplements, Netnutri, Muscle Foods USA, Black Diamond Supplements, Nutrition Jungle, APS Nutrition, World Class Nutrition, All Star Health, Lockout Supplements, Netrition, Inc., Europa Sports Nutrition, and the Kroger Company.

106.   Defendants may have also sent the defamatory letter to other customers of Hi-Tech, but Hi-Tech does not currently know the full extent of Defendants' mailings.

107.   As a direct result of this letter being sent to Hi-Tech's customers, certain retailers and distributors including the Kroger Company, Vitacost.com, Inc., and Europa Sports Nutrition, notified Hi-Tech they would not be selling the subject Hi-Tech products until, at least, the current litigation against Hi-Tech in the Northern District of Georgia is resolved.

108.   Upon information and belief, as a direct result of this letter being sent to Hi-Tech's customers, Hi-Tech has also lost product sales to other customers that did not affirmatively notify Hi-Tech they would be discontinuing sales.

109.   As a direct result of this defamatory letter being sent to Hi-Tech's customers, the Kroger Company, Vitacost.com, Inc., and their respective companies, affiliates, employees, officers, and directors, have requested that Hi- Tech defend, indemnify, and hold harmless these entities and persons against any related patent infringement litigation by ThermoLife.

110.   Upon information and belief, Defendants made false and misleading statements concerning Hi-Tech's alleged infringement of the aforementioned patents in bad faith and with the intent to wrongfully obtain settlement monies and/or licensing fees from Hi-Tech, to defame Hi-Tech, and to wrongfully interfere with Hi-Tech's business and business relationships.

111.   As a result of Defendants sending their March 17, 2015 letter to Hi-Tech's customers, Hi-Tech has suffered damages in the form of lost sales and profits, lost business opportunities, damage to its reputation, actual and potential legal fees and litigation costs to defend its customers against suits by ThermoLife, and other damages in an amount to be determined at trial.

3. The Three Lawsuits Against Hi-Tech and Hi-Tech Customers in the District Court for the Northern District of Georgia.

112. On or about March 27, 2015, ThermoLife filed three suits against Hi-Tech, falsely claiming Hi-Tech infringed upon ThermoLife's patent numbers 8,455,531; 8,466,187; 8,183,288 (the '531, '187, and '288 Patents, respectively) ("the patents-in-suit," collectively).

113. Hi-Tech is the only Defendant common to the three suits, and the other named Defendants are 17 of Hi-Tech's customers, which allegedly infringed upon ThermoLife's patents by selling various Hi-Tech products.

114. According to the patents in question, Kramer and the aforementioned man from Greece invented compounds using certain amino acids in combination with a nitrate or nitrite for various dietary supplement purposes.

115. Each of the patents at issue, however, contain claims dependent upon, or derived from, the invention of amino acid compounds set forth in the '074 patent, including, but not limited to, Creatine Nitrate. The USPTO in its April 2, 2014 "Final Rejection" rejected the '074 patent claim directed to Creatine Nitrate, as did the PTAB in its February 1, 2016 "Final Decision."

116. Thus, each of patents at issue in the current litigation are derivative or dependent upon the '074 patent claims already rejected by the USPTO and PTAB.

117.   Further, in May of 2015, the USPTO rejected all 102 claims of the '531 Patent.  ThermoLife, however, subsequently amended the first 61 claims and added 61 new claims to the '531 Patent.  ThermoLife is currently awaiting further action by the USPTO.

118.   Claims contained in the '531 Patent at issue are also invalid on another basis. Specifically, ThermoLife's earlier '288 and '187 Patents already "patent" the use of certain amino acid and nitrate or nitrite compounds for "increasing the bioabsorption of Amino Acids" and "increasing vasodilative characteristics of Amino Acids."

119.   Moreover, ThermoLife's allegations of infringement of at least United States Patent No. 8,455,531 (the "'531 patent"), and similarly as to each patent related thereto, are barred because the '531 patent is unenforceable pursuant to 37 C.F.R. § 1.56 and the doctrine of inequitable conduct.

120.   The '531 patent was filed on March 2, 2011 and granted on June 4, 2013. The listed inventors are Ronald Kramer and Alexander Nikolaidis. The '531 patent states that it is assigned to ThermoLife International, LLC. The patent application that resulted in the '531 patent was originally filed by the law firm of Booth Udall Fuller, PLC.

121.   The '531 patent is generally directed to an amino acid composition comprising at least one constituent selected from a nitrate, a nitrite or both, and at least one constituent selected from a group of amino acids. The '531 patent is also generally directed to methods for increasing bioabsorption of amino acids and methods for increasing vasodilative characteristics by administering a pharmaceutically effective amount of the claimed amino acid compositions.

122.   During prosecution of the '531 patent, the USPTO made an obviousness-type double-patenting rejection based on the '074 patent which issued from a common parent application to the '531 patent, and which lists the same inventors and assignee. Double patenting results when the right to exclude granted by a first patent (here, the '074 patent) is unjustly extended by the grant of a later issued patent or patents (here, the '531 patent).  The '531 applicant overcame the rejection by submitting a terminal disclaimer, or a disclaimer that any alleged right to exclude based upon the '531 patent could not extend beyond the time of any alleged right to exclude based upon the '074 patent.

123.   During the pendency of the '531 patent application, reexamination of the '074 patent was requested and granted, based on two separate reexamination requests. The first reexamination request (90/011,394) filed on December 17, 2010, was based on references to Ramaswamy, Rajkumar, Petrosyan and McCoy. A

"reference" means prior art.  The second reexamination request (90/011,869) filed on August 18, 2011, was based on a reference to Barger. The two reexaminations were consolidated.

124.   The reference to Barger expressly discloses creatine nitrate, which was claimed in the '531 patent application. Barger is therefore material prior art to the '531 patent application.

125.   Thus, the Barger reference was cited to the '531 applicant and their counsel in the reexamination of the related '074 patent on August 18, 2011, during the pendency of the '531 application. However, Barger was never cited to the USPTO in the '531 application.

126.   Despite the overlap in subject matter, assignee, and inventors of the '074 patent in reexamination, and the '531 patent application, the '531 patent applicant did not disclose the Barger reference to the USPTO during prosecution of the application that resulted in the '531 patent.

127.   45. As a result, the examiner that considered the novelty and/or validity of the '531 patent could not and did not consider whether the invention claimed in the '531 patent was patentable over the Barger reference cited to ThermoLife's counsel in the '074 reexamination.

128.   Upon information and belief, Kramer and others involved in the prosecution of the application that matured into the '531 patent intentionally, knowingly, and willfully failed to disclose material prior art during prosecution of the '531 patent with the intent to deceive the USPTO and wrongfully extract money from Hi-Tech and its customers. If the individuals involved in the prosecution had disclosed the Barger reference, then the USPTO would have refused to issue the '531 patent.

129.   As such, the inventors, applicant, counsel, and others involved in the prosecution of the application that matured into the '531 patent committed inequitable conduct, and the '531 patent is, therefore, unenforceable. The same arguments as to the '531 patent are applicable to at least the patents-in-suit that claim the use of creatine, because each is derived from the '074 patent.

130.   Furthermore, prior to filing the '531 and '187 patents at issue in this case, Kramer, ThermoLife, and its counsel submitted a new dietary ingredient application ("NDI") to the FDA for creatine nitrate. In that application, the parties submitted numerous references ("NDI prior art") for the proposition that nitrates are safe. Yet, on information and belief, the NDI and NDI prior art, and in particular its teachings and evidence and statements that nitrates are safe, constitute material, non-cumulative prior art that was never submitted to the USPTO during the prosecution

of any of the ThermoLife patents. Moreover, in direct contradiction to statements made in the NDI, ThermoLife and its counsel are now arguing in reexamination proceedings that the prior art teaches one of ordinary skill that nitrates are not safe for use in the human body. In making these arguments, ThermoLife and its counsel continue to fail to disclose the NDI and the NDI prior art to the USPTO.

131.   In August of 2015, the USPTO issued a "Final Rejection" of the first three claims of the '187 Patent.  The USPTO subsequently ordered a reexamination of all 60 claims of the '187 Patent following a request for same by a third-party unrelated to Hi-Tech.  ThermoLife has since amended all 60 of the '187 Patent's claims and is awaiting further action by the USPTO as of the date of this filing.

132.   As for the '288 Patent, on or about December 7, 2015, the USPTO rejected the '288 Patent's claim pertaining to Creatine Nitrate.  ThermoLife later amended this rejected claim, added 12 new claims, and is awaiting further action by the USPTO as of the date of this filing.

133.   Thus, in the months after ThermoLife's filing of the Northern District of Georgia suits against Hi-Tech and its customers, the USPTO issued non-final or final rejections of each of the patents at issue in those cases.

134.   Defendants, however, are wrongfully prolonging the finality of the reexamination proceedings of these three patents, as its other patents, by repeatedly

asking for unnecessary 30-day extensions and frivolously adding and/or amending claims to each of the patents.

135.   The three lawsuits in the Northern District of Georgia are stayed, or on hold, pending the completion of these reexamination proceedings.

136.   While several of ThermoLife's patents, including all four Patents-In-Suit, are being reexamined by the USPTO, ThermoLife and Kramer continue to brazenly assert them notwithstanding the fact that they are all likely to be invalidated.

137.   In sending the March 17, 2015 demand letter to Hi-Tech and its customers, and in filing suit against Hi-Tech and its customers, Defendants falsely implied that Defendants or their counsel had performed an adequate pre-suit investigation to determine likely infringement and/or the validity of the patents-in-suit.

138.   Neither Defendants nor their counsel, however, performed such a pre-suit investigation because an adequate investigation would have revealed the invalidity of the patents-in-suit.

139.   In the alternative, Defendants and/or their counsel did perform an adequate pre-suit investigation to determine likely infringement and/or the validity of the patents-in-suit and discovered the invalidity of the patents-in-suit but

nevertheless elected to file suit against Hi-Tech and its customers despite knowledge of the patents-in-suit's legal invalidity.

140.   In sum,' Defendants' assertions and legal claims on the basis of the patents-in-suit are objectively and subjectively baseless - and thus fraudulent - because the patents-in-suit are not valid, and Defendants knew or should have known that to be the case.

141.   Defendants have made false and misleading statements concerning Hi-Tech's alleged infringement of the patents-in-suit, and filed the related fraudulent lawsuits and with the intent to wrongfully extract money from Hi-Tech and Hi-Tech's customers, to defame Hi-Tech, and to wrongfully interfere with Hi-Tech's business and business relationships.

142.   Hi-Tech denies that it has infringed upon the patents-in-suit and contend that these patents are and were invalid as a matter of law and known to be so by Defendants.

143.   Accordingly, there is an actual, live and justiciable controversy between ThermoLife and Hi-Tech as it relates to the patents.

144.   Hi-Tech is entitled to declaratory relief because, although Hi-Tech has not infringed upon the patents-in-suit, Hi-Tech will continue to commercialize

products that ThermoLife alleges infringe its patents, even though the patents are not infringed and are invalid.

145.   As a result of Defendants' fraudulent lawsuits set forth herein, Hi-Tech has sustained damages in the form of lost sales and profits, lost business opportunities, damage to its reputation, actual and potential legal fees and litigation costs to defend its customers against suits by ThermoLife, and other damages in an amount to be determined at trial.

4.   Hi-Tech's Counterclaims Against Defendants in the Northern District of Georgia.

146.   In response to ThermoLife's Complaints against Hi-Tech in the three Northern District of Georgia lawsuits, Hi-Tech filed Counterclaims against Defendants relating to their patent trolling activities and the resulting, and intended, damage to Hi-Tech.

147.   Specifically, Hi-Tech filed Counterclaims against Defendants relating to Defendants' bad faith assertions of patent infringement in violation of O.C.G.A. § 10-1-770, *et seq*.; violations of Georgia's Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370, *et seq*.; unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); tortious interference with business relations and potential business relations; civil conspiracy; and violations of Georgia's Racketeer Influenced and Corrupt Practices Act.

148.  Hi-Tech's Counterclaims are stayed pending the USPTO's reexamination of the patents at issue in the Northern District of Georgia.

## A.   Defendants' Perpetuation of Their Patent Trolling Activities Through the Recent Licensing of Patent 9,180,140.

149.  As of December 31, 2015, ThermoLife purportedly licensed U.S. Patent Number 9,180,140 ("the '140 patent") from Heartbeet, Ltd., a British company.  A copy of the '140 patent is attached hereto as "Exhibit B."

150.  Upon information and belief, in the course of and in furtherance of obtaining this patent license, Defendants sent or caused to be sent correspondence, other documents, and/or funds via common carrier and/or electronic submission which entered international and/or interstate commerce.

151.  Upon information and belief, Defendants do not market or sell any product utilizing any claim of the '140 patent, and have no intention of doing so.

152.  Upon information and belief, Kramer, in the name of ThermoLife, licensed the '140 patent for the sole purpose of coercing settlements and licensing agreements from entities in the dietary supplement industry, including Hi-Tech specifically.

153.  At 11:40 p.m. on March 26, 2016, the night before Easter Sunday, counsel for ThermoLife e-mailed counsel for Hi-Tech a letter representing Defendants' un-wavering intent to pursue the business of patent trolling with its

recently licensed patent.  A copy of this letter without enclosures, which was sent to two of Hi-Tech's attorneys in the Atlanta area, is attached hereto as "Exhibit C."

154.   Upon information and belief, this e-mail to counsel was sent at the direction of Kramer and entered international and/or interstate commerce.

155.   In this letter, Defendants accuse Hi-Tech of infringing upon the '140 patent through the marketing and sale of eight products under various Hi-Tech brands.

156.   Defendants demand that Hi-Tech, within 13 days, stop offering for sale, selling, distributing, and/or marketing the eight products and provide written confirmation of same.  Defendants further demand that Hi-Tech, within 13 days, remove all references to the eight products from any and all websites, electronic media, and print media under its control and hold all remaining inventory. Defendants further demand that Hi-Tech provide Defendants with written confirmation of the foregoing, and other information, within 13 days – an unreasonable amount of time in light of the allegations and demands made.

157.   Defendants state that upon receipt of this written confirmation, ThermoLife "would welcome the opportunity to discuss an amicable resolution of this matter."

158.   Defendants further state that absent Hi-Tech taking the aforementioned actions and providing the written confirmation, ThermoLife will "vigorously enforce its intellectual property rights" against Hi-Tech and apparently its retailers and distributors.

159.   Neither ThermoLife nor Kramer are the inventor or a joint inventor of the '140 patent, and neither ThermoLife nor Kramer are the original assignee of the patent.

160.   Neither ThermoLife nor Kramer are an institution of higher education or a technology transfer organization owned or affiliated with an institution of higher education.

161.   Further, as set forth herein, neither ThermoLife nor Kramer have demonstrated good faith business practices in previous efforts to enforce any substantially similar patent.

162.   Moreover, while Defendants' March 26, 2016 letter enclosed their "Initial Infringement Analysis" with respect to each product, Defendants' allegations of infringement are obviously incorrect and nonsensical.

163.   For instance, Defendants' letter states that the '140 patent "relat[es] to nitrate technology which does not involve amino acids."  And, in fact, each claim of the '140 patent expressly requires an "inorganic nitrate" compound.  However, the

only nitrate-containing ingredient in many of the products identified in the letter is "creatine nitrate" which, as Defendants are well aware, is an organic amino acid compound. *See, e.g.,* https://en.wikipedia.org/wiki/Creatine ("Creatine is a nitrogenous organic acid") (Attached as "Exhibit D").

164.   Further, upon information and belief, at least the prior art listed on the face of the '140 patent constitutes prior art to that patent, rendering the patent unoriginal, obvious and, in turn, invalid.

## COUNT I

## DECLARATORY JUDGEMENT: NON-INFRINGEMENT

### *Against ThermoLife*

165.   Hi-Tech incorporates by reference Paragraphs 1 though 16 and 149 though 164 above as though fully set forth herein.

166.   Hi-Tech does not infringe any valid claim of Patent number 9,180,140 under 35 U.S.C. § 271(a).

167.   Hi-Tech did not and does not induce others to infringe any valid claim of the '140 patent under 35 U.S.C. § 271(b).

168.   Hi-Tech did not and does not contributorily infringe any valid claim of the '140 patent under 35 U.S.C. § 271(c).

169.   ThermoLife's wrongful allegations of infringement of the '140 patent and Hi-Tech's denial of those allegations create the existence of an actual controversy under 28 U.S.C. §§ 2201 and 2202.

170.   This controversy is amenable to specific relief through a decree of a conclusive character.

171.   Hi-Tech seeks a judgment that it has not infringed and is not infringing and that its products have not and do not infringe any valid and enforceable claim of the '140 patent in any way, whether directly or indirectly, literally or under the doctrine of equivalents.

## COUNT II

### DECLARATORY JUDGEMENT: INVALIDITY OF
### THE '140 patent

### *Against ThermoLife*

172.   Hi-Tech incorporates by reference Paragraphs 1 through 16 and 149 though 171 above as though fully set forth herein.

173.   The patents-in-suit do not comply with the requirements of the Patent Act and, therefore, are invalid. In particular, the patents-in-suit do not comply with one or more of Title 35 U.S.C. §§ 101,102, 103, and/or 112.

174.   One or more claims of the '140 patent are invalid under 35 U.S.C. § 101 because they fail to claim a new and useful process, machine, manufacture, or

composition or matter, or any new and useful improvement thereof.  Accordingly, they are invalid for failure to claim patentable subject matter.

175.   Upon information and belief, at least the prior art listed on the face of the '140 patent constitutes prior art to that patent.  At least the independent claims of the '140 patent are invalid under 35 U.S.C. §§ 102 and/or 103 because one or more prior references, either alone or in combination, disclose at least the independent claims of the '140 patent; and/or that the alleged inventions claimed therein are obvious to one having ordinary skill in the art in view of the prior art.

176.   Upon information and belief, one or more claims of the '140 patent are invalid under 35 U.S.C. § 112 for lack of written description, lack of enablement, and because the claims are vague and indefinite.

177.   A genuine and justiciable controversy exists between Hi-Tech and ThermoLife regarding the validity of the '140 patent.

178.   Hi-Tech seeks a judgment that the '140 patent is invalid for failure to satisfy one or more of the requirements of Title 35, including without limitation, sections 101,102, 103, and/or 112.

## COUNT III

### BAD FAITH ASSERTION OF PATENT INFRINGEMENT IN VIOLATION OF O.C.G.A. § 10-1-770, *ET SEQ.*

### *Against ThermoLife and Kramer*

179.   Hi-Tech incorporates by reference Paragraphs 1 through 178 above as though fully set forth herein.

180.   Hi-Tech is a "target" within the meaning of O.C.G.A. § 10-1-770(3), as Defendants have sent Hi-Tech a demand letter asserting allegations of patent infringement and threatened litigation against Hi-Tech and its customers.

181.   As set forth herein, Hi-Tech's customers are "targets" within the meaning of O.C.G.A. § 10-1-770(3), as ThermoLife has threatened them with litigation alleging patent infringement.

182.   As set forth herein, in their March 26, 2016 demand letter, Defendants made claims or assertions of patent infringement against Hi-Tech, which they knew, or should have known, were meritless and false.

183.   Further, in sending their demand letter to Hi-Tech, Defendants falsely and wrongfully:

    a.  Represented that Hi-Tech's products infringed upon the '140 patent;

    b.  Represented that certain Hi-Tech products could not be legally

sold;

c.  Used legal counsel to imply that Defendants had performed a sufficient pre-suit investigation, including investigation into the target business and its potentially infringing activities, that would be required to justify filing a lawsuit;

d.  Represented that ThermoLife was the exclusive source for the type of products allegedly covered by the Patents and/or that use of the ingredients allegedly covered by the Patents was only permissible through a license from ThermoLife;

e.  Represented that ThermoLife has a valid cause of action against Hi-Tech and Hi-Tech's customers unless Hi-Tech discontinues marketing and selling selling certain products;

f.  Shifted the entire burden of the pre-suit investigation onto the business that received the letter.

184.   As set forth herein, in their March 26, 2016 demand letter, Defendants have made false and meritless assertions of patent infringement against Hi-Tech in bad faith.

185.   As set forth herein, Defendants have filed lawsuits making similar claims against Hi-Tech for patent infringement in the past, which courts or the USPTO have subsequently found to be meritless.

186.   Despite these circumstances, Defendants have not only acquired yet another patent for the purpose of making money off of its enforcement and sent yet another demand letter to that end, but also continue to make false, deceptive, meritless, and bad faith claims of patent infringement in the aforementioned litigation they have refused to dismiss in the District Court for the District of Arizona, the District Court for the Southern District of California, and the Northern District of Georgia.

187.   Defendants acted in bad faith in making the aforementioned assertions in its March 26, 2016 demand letter, such that their actions violate O.C.G.A. § 10-1-771, which prohibits bad faith assertions of patent infringement.

188.   Defendants' actions, including its aforementioned claims, assertions, and lawsuits alleging patent infringement on the part of Hi-Tech, have proximately caused injury to Hi-Tech by creating uncertainty with respect to Hi-Tech's business and Hi-Tech's relationships with its customers, by forcing Hi-Tech to file the current action, and other injury and damages in an amount to be determined at trial.

189.   Pursuant to O.C.G.A. § 10-1-773(c), Hi-Tech is entitled to recover general and special damages including restitution, punitive damages, treble damages, attorney fees, expenses of litigation, and other relief as the Court deems just and equitable.

190.   Moreover, Defendants' violative actions, as set forth herein, have caused, and will continue to cause immediate and irreparable injury to Hi- Tech. Hi-Tech, therefore, is entitled to an injunction under O.C.G.A. § 10-1-773(c) restraining Defendants, their agents, employees, representatives, and all persons acting in concert with them from engaging in or continuing to pursue bad faith claims, assertions, or lawsuits against Hi-Tech with respect to alleged patent infringement.

## COUNT IV

## CIVIL CONSPIRACY

### *Against ThermoLife and Kramer*

191.   Hi-Tech incorporates by reference Paragraphs 1 through 190 and all claims as though fully set forth herein.

192.   Defendants conspired and agreed amongst themselves and with others unknown to Hi-Tech to, among other things:

    a.   File meritless and fraudulent patent infringement lawsuits against Hi- Tech in bad faith;

b.  Tortiously interfere with Hi-Tech's right to conduct lawful business operations;

c.  Wrongfully coerce payments from Hi-Tech in the form of settlements and/or licensing fees based upon patents they knew or should have known were invalid;

d.  Falsely and misleadingly allege that Hi-Tech was infringing upon ThermoLife's patents in correspondence;

e.  Distribute false and misleading allegations that Hi-Tech was infringing upon ThermoLife's patents in the marketplace;

f.  Disparage the goods and services of Hi-Tech through false and misleading assertions of fact;

g.  Obtain patents and license patents, which they knew or should have known were invalid, for the purpose of wronfully enforcing them for monetary gain;

h.  Defame Hi-Tech; and/or

i.  Tortiously interfere with Hi-Tech's business relations and potential business relations.

193.   The object of the conspiracy, as outlined above, was itself a legal wrong. Defendants also took one or more actions in furtherance of the conspiracy and, in fact, accomplished the objective of the conspiracy to the injury of Hi-Tech.

194.   Such conduct constitutes an agreement by, and among, Defendants and others unknown to Hi-Tech to commit an unlawful act, or to commit a lawful act in a lawful manner as proscribed by law.

195.   Defendants are, therefore, jointly and severally liable to Hi- Tech for their actions in conspiring as outlined above.

## COUNT V

### GEORGIA RICO
### VIOLATION OF O.C.G.A. § 16-14-4(a)

#### *Against ThermoLife and Kramer*

196.   Hi-Tech incorporates by reference Paragraphs 1 through 195 and all claims above as though fully set forth herein.

197.   Kramer is a "person" within the meaning of the Georgia RICO Law.O.C.G.A. § 16-14-1 et seq.

198.   ThermoLife and its officers, agents, and employees, are each a person within the meaning of the Georgia RICO Law. O.C.G.A. § 16-14-1 et seq.

199.   ThermoLife is an "enterprise" within the meaning of the Georgia RICO Law. O.C.G.A. § 16-14-3(6).

200.   Kramer was employed by, or associated with, ThermoLife within the meaning of the Georgia RICO Law. O.C.G.A. §16-14-4(b).

201.   In committing the acts described above, ThermoLife, and its officers, agents, and employees, including Kramer, repeatedly acted in furtherance of an unlawful scheme.

202.   The unlawful scheme included a scheme or artifice to deprive Hi-Tech of sales and profits by wrongfully interfering with its ability and right to conduct business by means of false or fraudulent pretenses or representations.

203.   The unlawful scheme included a scheme or artifice for obtaining money or property from Hi-Tech by means of false or fraudulent pretenses or representations.

204.   The unlawful scheme included a scheme or artifice to deprive Hi-Tech of money or property by wrongfully forcing Hi-Tech to incur attorneys fees and litigation expenses to defend itself against meritless claims by means of false or fraudulent pretenses or representations.

205.   The fraudulent pretenses or representations made in furtherance of the unlawful scheme set forth herein were material.

206.   In furtherance of the unlawful scheme, and for the purpose of executing, and attempting to execute, that scheme, Kramer, ThermoLife, and their agents and

employees repeatedly caused letters, pleadings, and other matters and things to be deposited with and delivered by the United States Postal Service and interstate couriers to various courts, Hi-Tech, and/or Hi-Tech's customers in repeated violation, or attempted violation, of 18 U.S.C. § 1341 (mail fraud).

207.   In furtherance of the unlawful scheme, and for the purpose of executing, and attempting to execute, that scheme, Kramer, ThermoLife, and their officers, agents, and employees, repeatedly received letters and other matters and things from each other, and others, which were delivered by the United States Postal Service and interstate couriers in repeated violation, or attempted violation, of 18 U.S.C. § 1341 (mail fraud).

208.   To the extent that any of these persons, Kramer, ThermoLife and their officers, agents, and employees did not participate directly in these acts of mail fraud, they knowingly and willfully caused, aided, abetted, counseled, commanded, induced or procured these violations of 18 U.S.C. § 1341 in violation of 18 U.S.C. § 2.

209.   Kramer, ThermoLife, and their officers, agents, and employees could reasonably foresee the use of the United States Postal Service and interstate couriers in connection with the execution of this unlawful scheme.

210.   Each of these "mailings" constitutes a separate incident or predicate act of "racketeering activity" under Georgia RICO.

211.   In furtherance of the unlawful scheme, and for the purpose of executing, and attempting to execute that scheme, ThermoLife, Kramer, and their officers, agents, and employees repeatedly transmitted, or caused to be transmitted, writings, signs, signals, pictures and sound communications transmitted in interstate commerce, including but not limited to, numerous interstate telephone calls, facsimile transmissions, email communications, and electronic submissions of documents, in repeated violation, of attempted violation, of 18 U.S.C. § 1343 (wire fraud). In furtherance of the unlawful scheme, and for the purpose of executing, and attempting to execute that scheme, ThermoLife, Kramer, and their agents and employees, repeatedly received, or caused to be received, writings, signs, signals, pictures and sound communications transmitted in interstate commerce, including but not limited to, numerous interstate telephone calls, facsimile transmissions, and email communications, in repeated violation, of attempted violation, of 18 U.S.C. § 1343 (wire fraud).

212.   To the extent that any of these persons ThermoLife, Kramer, and their officers, agents, and employees did not participate directly in the wire fraud, they

knowingly and willfully caused, aided, abetted, counseled, commanded, induced or procured these violations of 18 U.S.C. §§ 1343 and § 2.

213.   Kramer, ThermoLife, and their officers, agents, and employees could reasonably foresee the uses of the interstate wire communications in connection with the execution of this unlawful scheme.

214.   Each of these "interstate wirings" constitutes a separate incident or predicate act of "racketeering activity" under Georgia RICO.

215.   Each of the ThermoLife and Kramer's assertions of patent infringement against Hi-Tech, as set forth herein, constitutes a separate act of racketeering or predicate act in that each bad faith assertion of patent infringement (*i.e.* each cease and desist letter and lawsuit) constituted a separate effort to execute the scheme to defraud against Hi-Tech, and constitutes an attempted theft by taking in violation of O.C.G.A. § 16-8-12.   ThermoLife and Kramer took substantial steps towards the completion of the scheme through the licensing of the '140 patent and the transmission of the March 26, 2016 demand letter.

216.   Hi-Tech anticipates that in furtherance of the execution of this unlawful scheme, ThermoLife, Kramer, and their officers, agents, and employees will violate the perjury and false swearing statutes of this state, O.C.G.A. §§ 16- 10-70 (perjury) and 16-10-71 (false swearing). Each violation of these statutes constitutes, or will

when committed constitute, an additional separate incident or predicate act of racketeering activity under Georgia RICO.

217.   Each of these acts of racketeering activity was authorized, requested, commanded, performed, or recklessly tolerated by managerial officials of ThermoLife, including Kramer, and was done in furtherance of the execution of the unlawful schemes set forth herein by false representations, pretenses, and promises described herein.

218.   The multiple acts of racketeering activity by ThermoLife, Kramer, and their officers, agents, and employees were part of a common and continuous pattern of fraudulent acts and schemes, were perpetrated for the same or similar purposes, and were not a series of disconnected, isolated or sporadic acts. They were part of the regular and routine way ThermoLife conducts its business. The multiple acts of racketeering activity by ThermoLife, Kramer, and their officers, agents, and employees constitute a "pattern of racketeering activity" as defined in O.C.G.A. § 16-14-4(8).

219.   By reason of the foregoing, ThermoLife, Kramer and their officers, agents, and employees directly or indirectly, acquired or maintained control of a business enterprise through a pattern of racketeering activity in violation of the Georgia RICO Act (O.C.G.A. § 16-14-4(a)).

220.   As a direct and proximate result of these racketeering acts and this pattern of racketeering activity by ThermoLife, Kramer, and their officers, agents, Hi-Tech has been injured and damaged as set forth herein.

## COUNT VI

### GEORGIA RICO CLAIM VIOLATION
### OF O.C.G.A. § 16-14 -4(b)

#### *Against ThermoLife and Kramer*

221.   Hi-Tech incorporates by reference Paragraphs 1 through 220 above as though fully set forth herein.

222.   By reason of the foregoing, ThermoLife and/or Kramer and their managerial officials, agents, and employees have unlawfully, knowingly and willfully conducted and participated in, directly or indirectly, the affairs of ThermoLife through a pattern of racketeering activity in violation or attempted violation of O.C.G.A. §16-14-4(b). ThermoLife and/or Kramer's managerial officials, agents, and employees unlawfully, knowingly and willfully aided and abetted these violations and attempted violations of O.C.G.A. §16-14-4(b) in violation of O.C.G.A. §16-2-20.

223.   As a direct and proximate result of these violations of O.C.G.A. §16-14-4(b) by Defendants, and their managerial officials, agents, and employees Hi-Tech has been injured and damaged as set forth herein.

# COUNT VII

## GEORGIA RICO CLAIM VIOLATION OF
## O.C.G.A. § 16-14 4(c)

### *Against ThermoLife and Kramer*

224.   Hi-Tech incorporates by reference Paragraphs 1 through 223 above as though fully set forth herein.

225.   By reason of the foregoing circumstances and events, ThermoLife and/or Kramer, and their managerial officials, agents, and employees individually and collectively, unlawfully, knowingly and willfully, combined, colluded, conspired, endeavored, and continue to combine, collude, conspire, and endeavored, to violate the provisions of O.C.G.A. §16-14-4(a) and (b) in violation of O.C.G.A. §16-14-4(c).

226.   By reason of the foregoing circumstances and events, ThermoLife and/or Kramer, and their managerial officials, agents, and employees individually and collectively undertook overt acts in furtherance of their schemes as set forth herein.

227.   As a direct and proximate result of these violations of O.C.G.A. § 16-14-4(c) by ThermoLife and/or Kramer and their managerial officials, agents, and employees Hi-Tech has been injured and damaged as set forth herein.

## COUNT VIII

### PUNITIVE DAMAGES

#### *Against ThermoLife and Kramer*

228.   Hi-Tech incorporates by reference Paragraphs 1 through 227 and all claims as though fully set forth herein.

229.   Defendants' committed the violative, tortious, and conspiring actions, as set forth herein, willfully, maliciously, fraudulently, and with wantonness, oppression, and an entire want of care, which raises the presumption of indifference to the consequences, and entitles Hi-Tech to punitive damages in an amount sufficient to punish and deter such conduct by Defendants in the future.

## COUNT IX

### ATTORNEYS FEES AND COSTS

#### *Against ThermoLife and Kramer*

230.   Hi-Tech incorporates by reference Paragraphs 1 through 229 and all claims as though fully set forth herein.

231.   Defendants' committed the violative, tortious, and conspiring actions, as set forth herein, in bad faith and are liable for attorneys' fees and costs pursuant to O.C.G.A. § 13-6-11.

232.   Defendants have been stubbornly litigious and have caused Hi-Tech unnecessary trouble and expense in having to file these claims. Hi-Tech is entitled to an award of reasonable attorney fees and costs pursuant to O.C.G.A. § 13-6-11.

WHEREFORE, Plaintiff Hi-Tech Pharmaceuticals, Inc. respectfully requests this Court:

1.   Enter judgment in favor of Hi-Tech, and against ThermoLife and Kramer on each count of the Complaint;

2.   Enter judgment declaring that Hi-Tech has not and does not infringe any claim of the '140 patent in any way.

3.   Enter judgment declaring that each claim of the '140 patent is invalid.

4.   Enter a preliminary and/or permanent injunction enjoining Defendants and those associated with either of them from making statements, implications, threats, or claims against Hi-Tech (or its customers, agents, employees, or consumers of its products) based upon alleged infringement of the '140 patent.

5.   Enter judgment against Defendants for such sums as compensatory damages, trebled, as the evidence shall show the Defendants to be justly entitled to recover pursuant to OCGA § 16-14-6(c), as well as

punitive damages for deterrence in an amount sufficient to keep such wrongful conduct from being repeated, attorney's fees and litigation expenses, interest, if applicable, and all costs of this action;

6. Grant Hi-Tech injunctive relief and compensatory, general, treble, and punitive damages as otherwise set forth herein;

7. Enter judgment declaring that this case is exceptional in favor of Hi-Tech under 35 U.S.C. § 285 and that Hi-Tech be awarded its reasonable attorney fees and expenses;

8. Award Hi-Tech attorneys fees and costs as otherwise set forth herein;

9. Award Hi-Tech pre and post-judgment interest as otherwise set forth herein; and

10. Such other relief as the Court and jury deem proper, including, but not limited to, any of the orders or judgments against any or all of the Defendants as are authorized.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and all applicable law, Hi-Tech requests a trial by jury on all issues so triable.

Dated: April 11, 2016

*S/Arthur W. Leach*
Arthur W. Leach
Georgia Bar No. 442025
C.L. Parker
Georgia Bar No. 722011
*Counsel for Hi-Tech*
*Pharmaceuticals, Inc.*

The Law Office of Arthur W. Leach
5780 Windward Parkway, Suite 225
Alpharetta, Georgia 30005
Tel: 404-786-6443
Fax: 678-624-9852
Art@ArthurWLeach.com
CL@clparkerllc.com

*S/ John T. Gallagher*
John T. Gallagher
N.Y. Registration No. 2243020
*Motion to Appear Pro Hac Vice to be*
*filed.*

Hoffmann & Baron, LLP
6900 Jericho Turnpike
Syosset, New York 11791
Telephone: (516) 822-3550
Facsimile: (516) 822-3582
jgallagher@hbiplaw.com